JULIE C. CONNOR, CURRENTLY McINTYRE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Connor v. Commissioner
Docket Nos. 11843-80, 11844-80, 11845-80, 11846-80.
United States Tax Court
T.C. Memo 1982-302; 1982 Tax Ct. Memo LEXIS 442; 44 T.C.M. (CCH) 6; T.C.M. (RIA) 82302; June 2, 1982. Julie C. McIntyre, pro se. Stephen J. Waller, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal income tax for 1973 through 1976 inclusive, as well as additions to tax under section 6651(a)[1] for 1973 and 1975 as follows: Sec. 6651(a)
Year
Deficiency
Addition to Tax
1973
$ 2,195.31
$ 542.64
1974
$   234.30
1975
$ 2,726.20
$ 675.52
1976
$ 2,762.00
*444 The issues for decision are (1) whether petitioner is liable for income taxes on her one-half interest in the community income earned by her husband during the years in question; and (2) whether petitioner's failure to file a return for 1973 and 1975 was due to reasonable cause and not due to willful neglect within the meaning of section 6651(a). FINDINGS OF FACT Petitioner resided in Sedona, Arizona, when she filed her petition. Neither petitioner nor her former husband filed income tax returns for 1973, 1974, and 1975. Petitioner timely filed a separate Federal income tax return for 1976. Petitioner was married to James N. Connor (Mr. Connor) in 1965, and at that time they resided in Denver, Colorado. They moved to Sedona, Arizona, in approximately September 1971, and resided there, with their son, until they were divorced on June 14, 1976. Petitioner has since remarried. During their marriage, Mr. Connor's trade or business was that of a musician and song writer. For part of the years in question, he performed with a group called The Kingston Trio, and at least one of his songs was recorded by the popular singer, John Denver. As a performing musician, Mr. Connor *445 took available jobs which necessitated frequent travel away from home for considerable periods of time. These jobs usually lasted from 2 weeks to 2-1/2 months. When he made a tour of Japan or other distant places, he would be gone for several months at a time, returning home to Arizona only when there were breaks in his road schedule. Petitioner's sole source of income during the years in question (prior to the divorce) was provided by Mr. Connor. While he was traveling, Mr. Connor intermittently sent money home to petitioner, and she used it to pay monthly mortgage installments, utility bills, car payments, and other basic living expenses. The monies were never sent in large, lump payments, but were rather small amounts with which petitioner and her son eked out a meager existence. When on the road, Mr. Connor lived lavishly. Using cash when he had it and otherwise credit cards, he entertained frequently and expensively, charging large bills exceeding the credit card limits. The family telephone bill alone ran over $ 250 a month due to telephone calls he charged during his travels. He also received what petitioner classified as "strange" mail, mostly from women throughout *446 the world; upon occasion, he sent money to some of these female friends. Mr. Connor exerted nearly total control over petitioner's knowledge of family finances. He was the sole wage earner; his income-producing activities were largely performed away from home; he alone determined the small amounts he sent home to petitioner. Moreover, he took "great offense" at petitioner's inquiries about money, and refused to discuss his financial affairs with her, telling her that his income "was none of * * * [her] business." His total disclosure concerning their finances was that he was making "very little" money. Until the Internal Revenue Service contacted her in connection with its audit, petitioner was completely ignorant of the amount of money her husband earned through performances and royalties.[2] While she had some understanding about the Arizona community property law, she did not know that she was required to sign his tax returns or that she was responsible for taxes on one-half of his income. Pursuant to the divorce decree, *447 petitioner was awarded the house in which the Connors had been living, as well as a car and miscellaneous personal items. Mr. Connor was held responsible for all of the community's debts. In addition, he was ordered to make alimony payments of $ 750 per month. Although he paid $ 4,500 in alimony in 1976, he has since made no payments of any kind to petitioner. In a letter dated November 1, 1980, and witnessed by F. S. Martin, C.P.A., Mr. Connor stated that he assumed "full financial responsibility for payment of * * * [their] income tax liabilities for the years 1973, 1974, and 1975, and * * * [would] make appropriate arrangements for payment." OPINION Petitioner's liability for tax on income earned by her former husband depends on the State law definition of income ownership. [3]United States v. Mitchell,403 U.S. 190, 198 (1971). Under Arizona community property law, "[a]ll property acquired by either husband or wife during the marriage, * * * [with exceptions irrelevant *448 here], is the community property of the husband and wife." Ariz.Rev. Stat. Ann. sec. 25-211 (1976). Each spouse thus owns a vested one-half interest in the community income, Poe v. Seaborn,282 U.S. 101, 110 (1930); Goodell v. Koch,282 U.S. 118 (1930), and is liable for taxes on his or her one-half share. United States v. Mitchell,supra.
Mr. Connors' extensive traveling away from Arizona does not affect petitioner's tax liability, for even if he was in effect living "separate and apart" much of the time, his earnings would still be community income until the marriage was dissolved. Guerrero v. Guerrero,18 Ariz. App. 400, 502 P.2d 1077 (1972); see Jurek v. Jurek,124 Ariz. 596, 606 P.2d 812 (1980). Moreover, the fact that petitioner did not receive any benefit from, nor have dominion or control *449 over, a large portion of Mr. Connor's earnings, does not affect their tax liability. She owned the property under State law, and Federal law (secs. 1 and 3) imposes a tax on income owned by an individual under State law, because of such ownership and not on the basis of practical control. Poe v. Seaborn,supra;Hill v. Commissioner,32 T.C. 254, 257 (1959). No evidence of domicile in a noncommunity property State was presented. The Supreme Court's opinion in the Mitchell case controls, and we have no alternative but to hold that petitioner is liable for the deficiencies as determined. We recognize that this holding may seem to petitioner to be a harsh result. Its severity, however, is at least somewhat tempered by the facts that petitioner received support from Mr. Connor's earnings during the years in question and was awarded the family residence upon dissolution of the marriage. We note also, as stated in our findings, Mr. Connor has agreed to pay the income tax liabilities in dispute. Unfortunately for petitioner, neither one of the two "outs" fashioned by the courts [4] and Congress [5] can relieve petitioner in this case. We sympathize *450 with petitioner's plight, but we must apply the law as we find it. *451 Respondent also determined that petitioner is liable for additions to tax under section 6651(a)(1)[6] for 2 of the 4 years in question. While petitioner has the burden of proving error in this determination, Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1342 (1971), affd. per curiam 496 F.2d 876 (5th Cir. 1974), we think that she has carried her burden. Petitioner stated that she did not file tax returns for 1973, *452 1974, and 1975 because she did not know that her signature was required for a return reporting the income Mr. Connor earned, and she assumed that he was properly handling tax matters. Although such an assumption may often not be "reasonable," see Sanders v. Commissioner,21 T.C. 1012, 1020 (1954), affd. 225 F.2d 629 (10th Cir. 1955), in this case, where such an assumption was combined with a true inability to obtain requested financial information, we think "reasonable cause" existed. Petitioner's attempts to ascertain any information concerning her husband's income were met with hostility and falsehood. Because Mr. Connor's earnings derived largely from his extensive travels, he had complete control over the income itself and over petitioner's knowledge of it; he could--and did--obfuscate at will. We note that in the year of their divorce, petitioner timely filed a separate income tax return. We think that she was honestly ignorant of Mr. Connor's large income, found her inquiries angrily rebuffed, and had no choice but to trust her husband to attend to tax matters. These circumstances, we believe, show reasonable cause and not willful neglect *453 for her failure to file. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
2. As determined, the Connors' adjusted gross income for 1973 through 1976 was $ 24,357.03, $ 8,056.53, $ 28,108.74, and $ 39,462.71, respectively.↩
3. In United States v. Mitchell,403 U.S. 190, 197 (1971), the Supreme Court quoted from Burnet v. Harmel,287 U.S. 103, 110 (1932), as follows: The state law creates legal interests but the federal statute determines how and when they shall be taxed.↩
4. The Court of Appeals for the Fifth Circuit has held that, in cases involving an abandoned spouse, the spouse may be entitled to a "theft" loss deduction (sec. 165(c)(3)), if the other spouse's "wanton appropriation" of community income constitutes the "equivalent of a theft" under State law. Bagur v. Commissioner,603 F.2d 491, 502, 503 (5th Cir. 1979), revg. 66 T.C. 817 (1976). Without expressing any views as to the correctness of the Bagur↩ decision, we are not at all certain that Mr. Connor's failure to divide the community income equally would fall within the rule of that case. Theft losses are, moreover, deductible only in the year in which discovered. Sec. 165(e). In this case, petitioner did not discover the extent of her husband's unreported income and his appropriation of more than one-half of it until some considerable time after the 1976 divorce; since only the years 1973 through 1976 are before the Court, the possibility of an offsetting theft loss does not exist. 5. Congress has remedied the inequity in cases somewhat similar to petitioner's by devising a new section, sec. 66, which may relieve an abandoned spouse of liability on community income never received. While it is uncertain whether petitioner would meet the section's requirements (see sec. 66(a)(2)(A) and (a)(4)), sec. 66 clearly cannot aid her, for it applies only to calendar years beginning after 1980. Indeed, sec. 66's effective date was postponed 1 year by the Miscellaneous Revenue Act of 1980, Pub. L. 96-605, 94 Stat. 3521. We cannot make retroactive what Congress declined to apply to prior years.↩
6. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor * * * unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;↩