*Decision will be entered under Rule 155.*

ANN E. BELK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 34592-86.     Filed October 2, 1989.

*Jeanne Gramling,* for the petitioner.
*Robert C. Stephens* and *Stephen L. Smith,* for the respondent.

WHITAKER, *Judge:* By statutory notice dated May 27, 1986, respondent determined deficiencies in and additions to the Federal income tax of Henderson Belk and petitioner Ann E. Belk for the years and in the amounts as follows:

| Fiscal year ending | Deficiency | Sec. 6651(a)(1)[1] |
|---|---|---|
| June 30, 1976 | $505,312 | $126,328 |
| June 30, 1977 | 3,443 | 861 |
| June 30, 1981 | 212,541 | 10,627 |

The deficiencies arise primarily from the investment activities of petitioner's former husband, Henderson Belk. The issues before us are: (1) Whether petitioner qualifies for innocent spouse relief pursuant to section 6013(e) for 1976 and 1981[2] and (2) whether petitioner is liable for an addition to tax pursuant to section 6651(a)(1) for failing to timely file

---

[1]Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]References to tax years are to fiscal years ending June 30. Petitioner concedes that she is not entitled to innocent spouse relief for 1977, as the understatement does not exceed 25 percent of her preadjustment year adjusted gross income as required by sec. 6013(e)(4)(B).

a Federal income tax return for each of the years at issue. The items with respect to which petitioner claims innocent spouse treatment for 1976 are: (1) A long-term capital loss carryover of $2,108,885.37; (2) a short-term capital loss carryover of $47,712.40; (3) losses of $197,662 allowed in earlier years; (4) capital losses of $13,500 disallowed because of a clerical error; (5) a $15,000 charitable contribution; (6) small business corporation losses of $11,560; and (7) unreported income of $94,360. For 1981, petitioner seeks innocent spouse relief for the disallowance of a long-term capital loss of $1,118,634.

FINDINGS OF FACT

At the time she filed her petition, petitioner was a resident of Charlotte, North Carolina. Petitioner and Henderson Belk (the Belks) were married during the years before the Court and filed joint returns for each of those years. Henderson Belk's family had been engaged for many years in operating department stores throughout the southeastern United States. During the years before the Court, Henderson Belk received substantial dividend income from these stores. Henderson Belk was also the sole shareholder in Henderson Belk Enterprises (Enterprises), a corporation through which he invested in various other businesses, including motels, automobile dealerships, and radio stations. It was Henderson Belk's practice to claim a loss individually when an investment made through Enterprises became worthless. Such losses were claimed on the Belks' 1975 and 1976 joint returns.

*1976 Long-term Capital Loss Carryover*

The Belks' original 1974 Federal income tax return reported net long-term capital gains in the amount of $2,176,233.49. Notwithstanding the gains reported on this return, a long-term capital loss carryover in the amount of $1,500,000 was claimed on their 1975 return. An attachment to the 1975 return stated that the carryover was attributable to 1971, 1972, 1973, and 1974, and that the carryover was as yet undeterminable pending settlement of those years with the Appeals Division of the Internal Revenue

Service.[3] The attachment further stated that the actual carryover was expected to exceed $1,500,000. This carryover, when netted with the gross long-term capital gains of $662,454.93 reported for 1975, yielded a net long-term capital loss for 1975 of $837,545.07. However, the long-term capital loss carryover for 1976 was not computed with reference to this amount. Rather, previously unreported losses sustained in 1974 were used to calculate the long-term capital loss carryover for 1976. Those losses arose from the worthlessness during 1974 of the following investments made through Enterprises:

| | |
|---|---|
| Control Equipment, Inc. | $50,217.07 |
| Ranger Investment Co. | 44,277.99 |
| Honea Mazda, Inc. | 63,956.56 |
| Polar Vending Corp. | 448,439.50 |
| Freezie Corp. | 1,745,106.71 |
| Universal Health Spa, Inc. | 238,334.79 |
| Fantastic Imports, Inc. | 189,007.58 |
| Total | 2,779,340.20 |

To arrive at the long-term capital loss carryover of $2,108,885.27 claimed in 1976 these losses were adjusted for an $8,000 loss allowed in a prior year with respect to Control Equipment, Inc., and netted against the 1975 long-term capital gains but not against long-term capital gains reported in 1974.

A review of the 1975 return by an Internal Revenue Service agent in February 1978 revealed the discrepancy of a net gain in 1974 followed by a loss carryover in 1975. As the period of limitations for claiming a refund for 1974 was nearing expiration, a representative of Henderson Belk was contacted and told that it would be necessary to preserve any claim for refund for 1974 by filing an amended return. A second amended Federal income tax return for 1974 was filed on or about February 18, 1978, on which the Belks claimed long-term capital losses of $2,779,340.20 on the investments listed above. When netted with the previously reported long-term capital gain and adjusted for the $8,000 loss previously allowed, these losses gave rise to a net long-term capital loss in 1974 of $595,106.71 which was available to be carried over to 1975. When properly netted

[3]No losses were originally claimed on the returns for 1971, 1972, and 1973.

with long-term capital gains for 1975 of $662,454.53, the result is a net long-term capital gain of $67,347.22. Neither the 1975 nor the 1976 return was ever amended to reflect the proper carryover.

*Other Items for 1976*

On their 1975 return, the Belks claimed short-term capital losses in the amount of $48,712.40. Had their net long-term capital loss for 1974 and 1975 been properly computed, the Belks would have reported a net long-term capital gain of $67,341.22, and a net capital gain of $18,634.82. However, because the Belks erroneously claimed a net long-term capital loss in 1975, the short-term capital loss reported in that year was carried over to 1976, less $1,000 that was claimed as a deduction in 1975 pursuant to section 1211(b).

The Belks claimed losses for 1976 in the amount of $197,662 which respondent disallowed for that year but allowed for 1974 and 1975. Due to a clerical error, they claimed a loss of $1,500 as a loss of $15,000, the excess of which respondent disallowed. Respondent also disallowed a deduction for a charitable contribution in the amount of $15,000 for exercise equipment donated to Northside Baptist Church. This equipment was actually owned by Universal Health Spa, Inc., a corporation owned by Henderson Belk. Respondent also disallowed small business corporation losses in the amount of $11,560, based upon prior adjustments agreed to by a corporate officer of the corporations involved. Finally, Henderson Belk failed to report income in the amount of $94,360.

*Losses Claimed for 1981*

On their 1981 Federal income tax return, the Belks claimed, among other losses, a long-term capital loss due to the worthlessness of Henderson Belk's investment in Enterprises. Attached to that return was the following statement:

STATEMENT TO ACCOMPANY FORM 1040 FOR YEAR ENDING JUNE 30, 1981 HENDERSON AND ANN E. BELK SOCIAL SECURITY NO. 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

Taxpayers' Individual Income Tax Returns (Forms 1040) for the tax years ended June 30, 1974, June 30, 1975, June 30, 1976, and June 30, 1977, have been audited by the Internal Revenue Service.

In the Revenue Agent's Report for these years, the position was taken that certain investments which taxpayer made were contributions to the capital of Henderson Belk Enterprises (a corporation the stock of which taxpayer owns 100%) and, therefore, such investments to the extent that losses resulted therefrom, were deductible only by Henderson Belk Enterprises. Taxpayer has filed with the Appeals Office, Internal Revenue Service, Greensboro, North Carolina, a formal protest of these findings.

Since Henderson Belk Enterprises was at June 30, 1981, hopelessly insolvent, taxpayer has included on Form 1040 for the June 30, 1981, tax year a loss amount which includes his investment in the corporation, loans to the corporation, and the amount alleged by the Internal Revenue Service to have been contributions to capital in various earlier tax years.

Although this position is contrary to that taken in the protest for these earlier tax years, taxpayer must of necessity protect himself from the statute of limitations precluding deductibility of these losses and therefore this tax return is in effect a protective claim.

Because respondent granted timely filed requests for extensions within which to file their 1976 and 1977 returns, the Belks' returns for those years were due on March 15, 1977, and February 15, 1978, respectively. Their 1976 return was filed on or about September 14, 1977, and their 1977 return was filed on or about December 15, 1978. With respect to their 1981 return, the Belks were granted three 2-month extensions to file until April 15, 1982. A fourth extension was requested and denied on April 21 on the grounds that the application for that extension was filed after the due date of the return, and that the maximum extension allowed is 6 months. No grace period for filing was allowed. That return was filed on or about May 3, 1982.

During the years in issue, petitioner engaged in no activity with respect to any of Henderson Belk's business activities. The Belks even kept separate checking accounts, and petitioner never made inquiry of Henderson Belk's financial matters. Their tax returns through 1976 were prepared by Belk Stores Services. Their 1981 Federal income tax return was prepared by an independent accounting firm.[4] Petitioner did not examine any of her Federal income tax returns before signing them. Neither did petitioner make any inquiry with respect to those tax returns. Petitioner was unsophisticated in tax and financial matters,

---

[4]Their 1977 return bears no signature of a paid preparer.

and the returns were quite complex. Petitioner did not know the meaning of the term "capital loss carryover."

On August 27, 1984, Henderson Belk filed a petition pursuant to chapter 7 of the U.S. Bankruptcy Code. Petitioner did not join Henderson Belk in his bankruptcy petition. The Belks were later sued on a debt owed to a local bank, which looked solely to petitioner for recovery because of Henderson Belk's bankruptcy petition. Petitioner entered into a settlement with that creditor and paid the debt with the proceeds of the sale of some Belk company stock and two paintings.

The Belks and their children lived in a home on Hempstead Place in Charlotte from 1967 to 1980. In 1980, they purchased a smaller home on Museum Drive in Charlotte using the proceeds of a loan from NCNB Corp. Approximately 6 months later, the Hempstead Place residence was sold for a sum in excess of the loan balance due NCNB. However, petitioner never received any of the excess sales proceeds. The Museum Drive residence, like the Hempstead Place residence, was titled and recorded in petitioner's name only. Sometime during August 1984, but shortly before Henderson Belk filed his bankruptcy petition, petitioner deeded the Museum Drive residence to her mother. At the same time, petitioner's mother executed a deed of trust with respect to that property. Since that time, petitioner has received monthly payments from her mother in the amount of $3,000. These payments are partially offset by petitioner's $2,000 per month rent.

Petitioner's adjusted gross income in 1985 was $67,678.

### OPINION

Section 6013(a) allows a husband and wife to file a joint return even though one of them has no gross income and claims no deductions. In such case, the liability of each spouse is joint and several. Sec. 6013(d)(3). However, an "innocent" spouse may escape joint and several liability for certain items attributable to the other spouse if the following four conditions of section 6013(e)(1) are met:

(A) a joint return has been made under this section for a taxable year,
(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement * * *

The parties agree that petitioner filed a joint return with Henderson Belk. Respondent concedes that petitioner had no actual knowledge and had no reason to know of any understatement of tax for 1976. Respondent's only argument in this regard with respect to 1981 is that petitioner should have known of the understatement by virtue of the statement attached to the return concerning possible duplication of losses. For convenience, we address these innocent spouse requirements in reverse order.

The regulations promulgated under section 6013(e) define the term "inequitable" for purposes of section 6013(e)(1)(D). Sec. 1.6013-5(b), Income Tax Regs. The primary factor to be considered under the regulations is whether petitioner significantly benefited, either directly or indirectly, from the understatement.[5] In making this determination, normal support is not to be considered a significant benefit. Such support is a function of the standard to which a putatively innocent spouse had become accustomed, which in this case was relatively high. See *Busse v. United States*, 542 F.2d 421 (7th Cir. 1976). Not only did petitioner not significantly benefit above and beyond the standard of support to which she had become accustomed, but that standard actually fell in later years as a result of Henderson Belk's financial difficulties. Petitioner and her family moved into a smaller home, and even though the sales proceeds of their prior home were more than sufficient to cover the purchase price of the second home, petitioner received none of the excess. Further, petitioner compromised and paid a sizable debt for which her husband was partly, if not wholly, responsible.

---

[5]While the regulations speak in terms of a significant benefit from the omission of income, they predate the amendment of sec. 6013(e) which allows innocent spouse treatment for certain items relating to erroneous deductions.

We therefore find no significant benefit inured to petitioner as a result of the understatement.[6]

We do not find that petitioner knew or should have known of any understatement in 1981 by virtue of the statement attached to the 1981 return. Petitioner was unsophisticated in tax matters, and had nothing to do with the preparation of any tax returns for herself and Henderson Belk. We are equally satisfied that petitioner was wholly uninvolved in the examination of their joint tax returns in prior years. While a spouse cannot close her eyes to unusual or lavish expenditures, she is not required to have perfect knowledge of family financial matters. *Mysse v. Commissioner*, 57 T.C. 680, 699 (1972). Petitioner was quite unsophisticated in tax and financial matters, and we do not think that the statement attached to the return, which related to those matters, would have apprised petitioner of a potential duplication of claimed losses. We therefore hold that petitioner has satisfied the requirements of section 6013(e)(1)(C).

The parties' primary dispute is whether the understatement with respect to losses claimed on the 1976 and 1981 returns is attributable to grossly erroneous items of Henderson Belk. "Grossly erroneously items" are defined in section 6013(e)(2) as items omitted from gross income and claims for deduction, credit, or basis in an amount for which there is no basis in fact or law. While the Code has allowed relief for an innocent spouse since 1971, sec. 1, Pub. L. 91-679, 84 Stat. 2063, it was not until 1984 that innocent spouse relief became available for all such items. Sec. 424(a), Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 801, 1984-3 C.B. (Vol. 1) 309. However, while the mere showing of omitted income satisfies the requirement of a grossly erroneous item, the same is not true for deductions. Not only must it be shown that the deduction was erroneous, but it must also be shown that it has no basis in fact or law. As we stated in *Douglas v. Commissioner*, 86 T.C. 758, 763 (1986), "it simply does not follow that because deductions lacking in a factual or legal basis will be disallowed, all deductions which are disallowed lack a factual or legal basis." The burden of proving that an erroneous deduction

---

[6]Respondent apparently does not dispute this point since he did not address it on brief.

is a grossly erroneous item is on petitioner. *Purcell v. Commissioner*, 86 T.C. 228, 240 (1986), affd. 826 F.2d 470 (6th Cir. 1987).

There is no statutory definition of the phrase "no basis in fact or law." However, we have previously stated that

a deduction has no basis in fact when the expense for which the deduction is claimed was never, in fact, made. A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility. Ordinarily, a deduction having no basis in fact or in law can be described as frivolous, fraudulent, or, to use the word of the [Ways and Means] committee report [on the Tax Reform Act of 1984], phony.

*Douglas v. Commissioner, supra* at 762-763. See also *Purcell v. Commissioner*, 826 F.2d 470, 475 (6th Cir. 1987), affg. 86 T.C. 228 (1986).

## 1976 Long-term Capital Loss Carryover

Petitioner argues on brief that the 1976 carryover is based upon losses sustained in 1974, but that those losses were not netted against the 1974 gains of $2,176,233.49 in calculating the carryover to 1976. We agree. The long-term capital loss of $2,779,340.20 which formed the basis for the 1976 carryover and was actually claimed on the second amended 1974 return is the sum of the losses sustained by investing through Enterprises in the businesses set forth in our Findings of Fact. Petitioner had been allowed a loss of $8,000 on one of those investments, Control Equipment, Inc., in an earlier year. When the loss as claimed on the second amended 1974 return is adjusted for this previously allowed loss, and the resulting figure of $2,771,340.20 is netted with the $662,454.93 gross long-term capital gain reported on the 1975 return, the result is $2,108,885.27, which equals the long-term capital loss carryover claimed on the 1976 return. Agent Head testified to this effect on cross-examination as follows:

Q: * * * is the conclusion you are drawing here that the carryovers into 1975 and 1976 are based on the 2.7 million [dollars], roughly, in losses claimed on the second amended 1974 return?

A: Yes, sir, with modifications.

Q: Okay. What were those modifications, just the increase you are pointing to there?

A: The $8,000 Control Equipment Company loss that was carried back to the earlier period—

Q: Okay.

A: —and also the long-term capital gain offset in fiscal year—I forget exactly which year that was: '75 or '76.

While agent Head testified that the 1976 loss carryover was based upon the losses eventually claimed on the second amended 1974 return, we think it is of no consequence that the 1974 return had not yet been prepared when the 1976 return was filed. We note that even on the face of those returns that had been filed prior to the time the 1976 return was filed, the carryover claimed on the 1976 return was without support. The 1975 return claimed a net long-term capital loss of only $837,545.07. A most cursory examination of the 1975 and 1976 returns reveals that the carryover to 1976 is overstated to the extent of the difference between the 1975 net loss and the carryover claimed on the 1976 return.

However, we find that the overstatement of the carryover extends beyond the difference between those two amounts, and that there is no basis in fact or law for the entire carryover to 1976. Section 1211(b)(1) states that "If a taxpayer other than a corporation has a net capital loss for any taxable year— * * * (B) the excess of the net long-term capital loss over the net short-term capital gain for such year shall be a long-term capital loss in the succeeding taxable year." Therefore, in order for the Belks to be entitled to a long-term capital loss carryover in 1976, two things must be proven with respect to 1975. First, there must have been a net capital loss.[7] Secondly, the net long-term capital loss must have exceeded the net short-term capital gain. The first of these requirements is not satisfied, and petitioner and Henderson Belk were therefore not entitled to a long-term capital loss carryover in 1976.

[7] A "net capital loss" is defined in sec. 1222(10) as "the excess of the losses from sales or exchanges or capital assets over the sum allowed under section 1211." In the case of an individual, sec. 1211(b) allows capital losses to the extent of capital gains plus (in this case) $1,000.

We have found that the 1976 carryover was based upon losses sustained in 1974. As is evidenced by the original 1974 return, there was no carryover to 1974 from prior years. Therefore, only the long-term capital losses sustained in 1974 are available to be netted with that year's long-term capital gains to determine the proper carryover to 1975. That carryover, plus that year's gross losses, are to be netted with the long-term capital gains for 1975. To determine if there is a net capital gain or loss, the net long-term capital gain or loss is netted with the net short-term capital gain or loss, which here is a loss of $48,712.40. When all these losses and gains are properly accounted for, there is no net capital loss in 1975:

| | |
|---|---:|
| Claimed 1974 losses | ($2,779,340.20) |
| Adjustment for loss allowed in prior year | 8,000.00 |
| 1974 long-term capital gains | 2,176,233.49 |
| 1974 net long-term capital losses; long-term capital loss carryover to 1975[8] | (595,106.71) |
| 1975 long-term capital gains | 662,454.93 |
| 1975 net long-term capital gain | 67,348.22 |
| 1975 net short-term capital loss | (48,712.40) |
| 1975 net capital gain | 18,635.82 |

Applying the test of *Douglas v. Commissioner,* 86 T.C. 758 (1986), we find that there is no basis in fact or law for the carryover to 1976, and that it is a grossly erroneous item. Petitioner has proven that she and Henderson Belk did not sustain losses sufficient to support the claimed carryover into 1976, and we therefore find that such carryover had no basis in fact. Petitioner has also proven that the carryover had no basis in law, since there would have been no net capital loss had the 1974 long-term capital losses been properly netted with the long-term capital gains for that year.

Respondent argues that at the time the 1976 return was filed, the year in which losses were proper was still in dispute, and that there was a basis in fact or law for such losses to be claimed on the 1976 return. Respondent's argument would be more persuasive, and possibly correct,

---

[8]This loss carryover, computed with reference to actual 1974 gains and losses, obviates the estimated long-term capital loss carryover of $1,500,000 claimed on the 1975 return.

had the Belks claimed actual losses in 1976 rather than a carryover from prior years. However, by claiming the losses as a carryover from 1974 rather than as having been sustained in 1976 the Belks in effect duplicated their 1974 losses. There can be no basis for such duplication. We therefore find for petitioner on this issue.

*Other Items for 1976*

With respect to the short-term capital loss carryover claimed on the 1976 return, section 1212(b)(1) provides that "If a taxpayer other than a corporation has a net capital loss for any taxable year—(A) the excess of the net short-term capital loss over the net long-term capital gain for such year shall be a short-term capital loss in the succeeding taxable year * * * ." The requirement of a net capital loss for a capital loss carryover is the same in the case of both long-term and short-term carryovers. As discussed above, this requirement is not met with respect to 1975. Therefore, petitioner and Henderson Belk were not entitled to a short-term capital loss carryover in 1976. Their claim of such a carryover therefore had no basis in fact or law for the same reasons as their claim for a long-term carryover.

Petitioner also argues that of the gross losses claimed on the 1976 return, $197,662 was disallowed for that year but was allowed in 1974 and 1975. Petitioner argues that these losses, having been moved to earlier years, are essentially part of the losses which formed the claimed carryover for 1976. While petitioner's argument may be factually correct, it does not ipso facto require that we hold in her favor. Unlike the carryovers claimed on the 1976 return, these losses were claimed to have actually been sustained in 1976, but were allowed in earlier years through an agreement with respondent. The treatment of an item as a result of such an agreement does not establish that the item is grossly erroneous. *Hawbaker v. Commissioner*, T.C. Memo. 1988-406. Petitioner's only argument with respect to these losses is her attempt to link them to the carryovers for which we have found there to be no basis in fact or law. We find no grounds for such linkage, and no other evidence that the Belks' claim that such losses were sustained in 1976 is

without a factual or legal basis. We therefore find for respondent on this issue.

We find that petitioner is entitled to innocent spouse relief with respect to the loss disallowed because of the clerical mistake in reporting a $1,500 loss as a $15,000 loss. There is obviously no basis in fact or law for claiming an increased loss due solely to such an error. We find for petitioner on this issue. With respect to the charitable contribution of $15,000 and the small business corporation losses of $11,560, petitioner has produced no evidence to support a finding that such items are grossly erroneous. We find for respondent with respect to those issues. Finally, section 6013(e)(2)(A) includes any omission from gross income within the definition of grossly erroneous item. Since we have found that petitioner was without knowledge of the income or deductions shown on the return, and that it would be inequitable to deny her innocent spouse relief, petitioner is entitled to innocent spouse relief with respect to the omission from gross income of $94,360.

*Losses Claimed in 1981*

Unlike the loss carryovers claimed on the 1976 return, the losses disallowed in 1981 were actually claimed to have been sustained in that year. The statement attached to the 1981 return stated that the losses were being claimed in 1981 only as a protective measure; i.e., if petitioner and Henderson Belk were not allowed losses for investments made *through* Enterprises in prior years, they should be allowed losses for investments made *in* Enterprises in the year when that investment became worthless. Petitioner does not argue that had the losses been disallowed in prior years, they would have been improper in 1981. In fact, it seems highly likely that had the earlier years' losses been disallowed, losses in 1981 would have been proper. In any event, petitioner has not proven that there was no basis in fact or law for claiming the losses in 1981 and we find for respondent on this issue.

*Addition to Tax Pursuant to Section 6651(a)(1)*

Petitioner argues that there is reasonable cause for the Belks' failure to timely file their 1976 and 1977 returns

because of the complicated nature of Henderson Belk's business enterprises and the difficulties in gathering information for the preparation of the returns. In support of her position, petitioner cites *Connor v. Commissioner,* T.C. Memo. 1982-302. In *Connor,* the taxpayer, a resident of a community property State, was found to have reasonable cause for failing to timely file a return since her husband, the family's sole source of income, refused to discuss family financial matters with her or provide her with information with which she could file a separate tax return. Because the taxpayer was "honestly ignorant of Mr. Connor's large income, found her inquiries angrily rebuffed, and had no choice but to trust her husband to attend to tax matters," we found that she had reasonable cause not to file and had not willfully neglected to do so. *Connor v. Commissioner, supra,* 44 T.C.M. 6, 9, 51 P-H Memo T.C. par. 82,302 at 82-1294. See also *Fleming v. Commissioner,* T.C. Memo. 1984-130.

However, the fact that a husband assumes the duty to file a tax return and fails to do so does not of itself provide the wife with reasonable cause for failure to file, at least where the wife has not taken steps to assure that her husband has performed this duty. See *Kern v. Commissioner,* T.C. Memo. 1985-402. Further, petitioner had the option of filing a separate tax return or simply not signing the 1976 return since she had no income or deductions. See *James v. Commissioner,* T.C. Memo. 1980-99. This case, like *Kern* and *James,* is distinguishable from *Fleming* and *Connor* in that knowledge of her husband's financial records was not required in order for petitioner to determine her own income and file her own return. Further, petitioner has not shown that she made any effort to see that their 1976 return was timely filed. We therefore hold that an addition to tax pursuant to section 6651(a)(1) is appropriate for 1976.

With respect to their 1981 return, which was due on October 10, 1981, the Belks received three extensions within which to file. These extended the filing deadline until December 15, 1981, February 15, 1982, and April 15, 1982, respectively. On April 14, 1982, they made a fourth request for an extension, which was denied in a notice dated April 21 and received on April 23. Petitioner argues that the

return, which was mailed on May 3, 1982, was filed within the 10-day grace period referred to in Rev. Rul. 64-214, 1964-2 C.B. 472, and was timely pursuant to that ruling and the timely mailed-timely filed provisions of section 7502. Respondent argues that he was precluded from granting a further extension of time pursuant to section 6081, that the Belks' fourth request for an extension was a useless act, and that the 10-day grace period does not apply. Respondent further argues that the Belks' reliance on that ruling after extensions totaling 6 months had already been granted does not constitute reasonable cause for purposes of section 6651(a)(1).

Petitioner recognizes on brief that the allowance of a 10-day grace period after denial of an extension of time within which to file "is a decision within the discretion of Respondent not to invoke the sanctions of Code Section 6651(a) if the return is filed within the grace period." See *Marcello v. Commissioner*, 380 F.2d 499, 503 (5th Cir. 1967).[9] In this case, the grace period was not allowed, and petitioner's argument that the 1981 return was timely as a matter of law must fail.

Petitioner also argues that the Belks' tax return preparers relied on the existence of the grace period referred to in Rev. Rul. 64-214, and that such reliance constitutes reasonable cause for the failure to file a timely return. We disagree. Section 6081 precludes respondent from allowing extensions in excess of 6 months. Indeed, the notice denying the Belk's fourth request for an extension notified them that the maximum extension had already been granted. We find that any reliance upon the allowance of a further grace period is unreasonable in such circumstances. The purpose of section 6081 is to preclude taxpayers from attempting to indefinitely delay filing their tax returns without risking the imposition of an addition to tax for such further delay. When a request for an extension in excess of 6 months is made, the statute requires that it be denied; respondent has no discretion with respect to granting a further extension. However, in those cases where the granting of a further extension is within respondent's discretion, the 10-day grace period is to provide some relief

---

[9]See also I.R.S. News Release 1107, Feb. 16, 1971.

to those taxpayers who reasonably but erroneously thought that their requests for extensions would be granted. The Belks and these return preparers could not reasonably believe that an additional extension would be granted by respondent, and we will not allow them to take for granted that the mere filing of a request for an extension of time carries with it a 10-day grace period. Therefore, an addition to tax pursuant to section 6651(a)(1) is appropriate.

In accordance with the foregoing,

*Decision will be entered under Rule 155.*